Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States and his honorable court. Good morning. Good morning. Welcome to our postponed arguments. I hope the postponement was worked out well for those who requested it and was not too much of an inconvenience for those who agreed to it. We only have one case this morning, obviously an important one. And three advocates on it. Looks like one of you is ready to go. Why don't you proceed? Thank you, your honor. May it please the court, Jerry Murnier with Gainesburg Benjamin appearing on behalf of the appellants. The appellants Cynthia Thibodeaux, Deborah Francis, Deborah Johnson and Tanya Francis are early stage breast cancer survivors who between the years 2008 and 2010 underwent chemotherapy in which the drug Taxotere manufactured by the defendant, the French company Sanofi, was included among a total of six different chemotherapy drugs administered to Ms. Thibodeaux and a total of three such drugs administered to Ms. Francis and Ms. Johnson. Each lady lost her hair during chemotherapy. Each had been advised by doctors and nurses that while this was to be expected, this chemo induced hair loss would be temporary without being told any specified timeline on the regrowth of the hair. None of these appellants was advised by a single doctor, nurse, healthcare provider, or medical pamphlet that because Taxotere was among one of the chemotherapy drugs being would be permanently and irreversibly impaired. Not even in their extensive treatment for their cancer following chemotherapy did the cancer patients in these cases, these three appellants treaters, ever make that link or association or suggested. And there's a reason to ask you, obviously, we're all familiar with what this case ultimately is going to turn on. I will ask, but don't forget, Ms. Eisenstein, the same thing later. Once, whenever a reasonable period of time passed for these three individuals to realize that the hair loss could well be permanent and would have turned either to their physicians or to what was available in the public arena, what would they have found up 2010, 11, 12, up to 2015? What was out there? There was nothing out there, your honor, at least nothing indicated in this record that before the label change of December, 2015, there had been any linkage made between Taxotere and post-chemotherapy permanent hair loss. Let me ask you in a case we had just a few weeks ago on the same docket, there was information that is mentioned there. Obviously, we're talking about different records, potentially in different cases. And the issue in that case was the lack of certainty, the validity or persuasiveness of the tests that were done or the, whether just anecdotal or whether they really were proving something. Are you saying that in this record, and I don't know if that was in the specific record of that case or in the MDL itself, there's no information that would indicate what your clients would have found before the label was changed? That's correct, your honor. And I think the record goes further to prove an effect that Sanofi was deliberately concealing the risk from healthcare providers, who would only learn about the risk through the label, which was not changed until December, 2015, even though in the clinical trials, Sanofi had documented the risk. And in fact, when it was raised by a physician as early as 2006, Sanofi discouraged medical research and denied it. And when the French and European regulators in 2011 came to Sanofi and said, we think you should consider updating your label because there are now reports of this, Sanofi said, no, there's not sufficient data. We're not going to change the label. So it really wasn't until December. Has this information been available to the general public or is this just confidential information among professionals? Specifically reports, your honor, from physicians and healthcare providers to the drug manufacturer. One thing that raised my interest in this case is that a long period of time went on where these people obviously knew that their hair was not going to grow back as customary and usual treatments and chemotherapy was not temporary. Did they make any kind of inquiry of their physician? I know that cancer patients, generally speaking, are in constant contact with their physicians over a period of several years. And was this never a subject that she brought up and tried to make some kind of inquiry as to why her hair was not growing back when others was growing back? Your honor, the testimony of the three appellants is that they continued to hold the belief that in time their hair might regrow. They never resigned themselves to permanent hair loss until they heard the announcements that this was in fact a risk with Taxotere. But I would also point out to the that, again, during that very period of time, they were receiving... Was that reasonable? Was that reasonable for them to just give up? I mean... Your honor, it... Not to give up or not to make a search for why is my hair not coming back when I have so many other acquaintances or instances in which hair has come back? Well, they had been told the chemotherapy loss was permanent. That was in their mind. They had never been told there would be any chemotherapy-related impairment of a regrowth. And they did know people whose hair was growing back more slowly, and they just figured they were among those people for whom it was going to take a while. Now, we can all, in retrospect, say that was a foolish hope, that they shouldn't have been optimistic, that these cancer patients should have just given up and resigned themselves to permanent hair loss. They did not in this case. I would submit to the court that if the question is whether that optimism or hope was reasonable, that is inherently a question for the jury and should preclude summary judgment. Let me ask you about Louisiana law on that. Certainly, both sides have given us a fair number of cases from Louisiana. And it seems like only a few have dealt with it as a jury issue. An awful lot of them are handling it as a judge decision. One of the cases you cite, M.R. Pittman v. Plaquemines, it does seem like it was sent back, if I recall the case correctly, for a jury to decide that issue along with the merits of the case, if it got that far. But in my own familiarity with Louisiana law, I'm always hesitant to apply concepts from otherwise. What's your best case to say that the reasonableness in this situation of this fairly extensive period of time against what you say and what Miss Eisenstein says about this, what you say is nothing could have been found even if these women had searched for it before 2015. What's your best case to say that this is really something for the jury and not for a judge to say just it is not, you know, it's not impossible that somebody could have waited, but it just wasn't reasonable? I think the best case I can cite is Crochet v. Bristol Myers Squibbs. You mean that unpublished Fifth Circuit opinion was a troubling panel? Well, one of the panelists, Judge Southwick, is here to respond to that characterization. But I Southwick, Graves, and Engelhardt properly decided in that case, even though the plaintiff researched the question, whether his symptoms could be related to Abilify, and did that more than one year before filing suit, the panel said, you know, that plaintiff in saying that he really didn't know enough at that time, may or may not have been acting reasonably. But that question of reasonableness must be for the jury, and even thin contrary evidence to the contrary, does not preclude the case being resolved by the jury. And as this court said in Nunez v. Superior Oil, the question of reasonableness under the circumstances is the equivalent of the question of foreseeability, or causation, or negligence. These general standard questions of reasonableness under all of the circumstances must, except in the most in the complaint, in your summary, individual reference summaries, to whether she made any kind of inquiry of her doctor or anyone else as to why her hair was so long in growing back compared to other persons. Your Honor, I know of no such testimony to that effect in the record. Why could we not hold, I mean, if we were inclined to, I guess this is a Louisiana case, probably shouldn't go there, but if we held that as a matter of law, you know, it is unreasonable for this person to have made no inquiries of any kind, notwithstanding the length of permanent hair loss. Your Honor, if I may answer the question, I would like to do it this way, I would like to state three principles of law, equity, and process under Louisiana law that govern that inquiry. Principle number one, when an injury giving rise to a legal claim is not apparent at the time it occurs, Louisiana's equitable tolling doctrine of contra non volentum suspends the running of the prescriptive period and the suspension continues in time until it is shown that the plaintiff is either actually or constructively aware of two things, one, her injury, two, a legal claim or cause of action against the defendant based on that injury. Louisiana stands not alone, but among a number of states which do not commence the running of prescription based on an actual or constructive awareness of an injury alone, Louisiana requires the possibility of a legal claim based on that injury being either known or reasonably knowable by the plaintiff. If not, the prescriptive period remains told. Principle number two, a drug manufacturer's deliberate concealment from the medical community of the drug-related risk of harm being sued upon itself may be viewed as suspending the prescriptive period Louisiana's contra non volentum doctrine, but at the very least, and as recognized in the case of Alexander versus Wyeth, which we cite, this concealment at the very least must be considered relevant and given weight, both as to the reasonableness of the plaintiff's delay in filing an action and as to any perceived obligation on the part of the plaintiff to investigate or inquire as to the cause of her harm or the basis for a claim against the We see a chart that shows a more than five or six year period of delay calculated between a permanent loss of injury date, which the district judge at Santa Fe's request imposed on each person, and we'll talk about that. The five or six year delay is charted between that supposed permanent injury date and the filing of suit. Of course, the real question is the delay between the first reasonable constructive awareness of a permanent injury, which is being sued upon and one year and one day before the filing of suit. But here's what's important. If I were presenting this properly to a finder of fact, I would call for a corresponding chart that would show that over that very same calendar period, there was a five or in some case, in one case, more than six year delay between the supposed constructive awareness of permanent injury and the December 2015 label change. In other words, during the very same period, we're asked to say as a matter of law, it was unreasonable for these women to delay either inquiring or filing a lawsuit during that same calendar period. The medical community had not been told anything that would link the permanent hair loss in question back to Taxotere, one of many chemotherapy drugs used. Counsel, I have a question that follows up, I think, on what Judge Southwick had asked. As you said, this contra non-valentum doctrine, it's an equitable doctrine. Usually in a common law jurisdiction, equitable issues are for the judge, not the jury. This is Louisiana, so I know it's not common law. It's its own animal. I guess basically coming back to the question Judge Southwick asked, you mentioned the Fifth Circuit case, what Louisiana cases say this is an issue for the jury, not the judge, even though it's an equitable doctrine? Well, I would say, first of all, the Crochet case, which I mentioned, and then I would say Body by Cook versus Ingersoll Rand Company, which is the Eastern District Louisiana case, fairly lengthy discussion there of how and why the contra non-valentum question of reasonable delay had been submitted to the jury. And there's ample citation of authority for why that is the rule. So even though, Judge, it is an equitable principle, at the heart of whether the principle of tolling applies or not is a reasonableness under the circumstances question. So even though we say, yes, equity is the province of the judge, in deciding the applicability, there has to be a reasonable determination, which is inherently a question of fact, because it frankly calls for the fact finder to consider all of the circumstances, both the futility of investigation I just mentioned, what these women have been told about temporary only, what else was going on in their lives, frankly, when they were dealing with cancer over these years and receiving multiple medications, et cetera, being seen by doctors who could see the state of their hair regrowth, and yet not in their own minds feel that it in any way was related to chemotherapy. And again, it's not just the awareness of the injury. It's not the awareness, the mere apprehension something's wrong. There is nothing in this record to suggest that these ladies should have had any actual constructive awareness to say there was a cause of action, that someone could be sued. And I also come into the court, the case of Cortez versus Dupuy Orthopedics decided by Judge Fellman. There, for 18 months after knee surgery, a man had pain. He knew he had knee pain. He had had knee replacement surgery. He did not file suit. He had revision surgery and they discovered, ah, the basis for your pain is that along the way, the bone cement failed. Never able to specify the precise date, but at some time. Judge Fellman said, look, if we are going to run the clock because the person is constructively aware of having pain after knee surgery, and the one year clock is running, then what you're going to invite are uninformed lawsuits. He may have to sue the manufacturer, the components, the doctor, the hospital. So that's exactly what Contra 9 is supposed to prevent. And it turns the doctrine on its ear. It makes much more sense and is far more equitable to start the clock running with the dual awareness as required in Louisiana of two things. Got to know about your injury, actually or constructively, but you also have to actually or constructively be aware of a possible cause of action associated with the injury. And so I think that probably satisfactorily answers Judge Costa's question. Your time is up. I'm not sure if Mr. Lambert is taking this pre-defendant time. Are you part of the rebuttal? I'll be doing the rebuttal. I think Mr. Lambert will speak now. You may proceed. Thank you, Your Honors. May it please the court, Palmer Lambert, also for appellants, to put a finer point on causation and its importance in the context of liberative prescription. The science in this case is complex and not undisputed. These three women were administered multiple chemotherapy drugs. And for 10 years after their chemotherapy, each appellant took hormone drugs, tamoxifen or arimidex, known to cause hair thinning. They were still on these drugs at the time they learned of the nexus between Taxotere and PCIA. Appellees deny causation at all levels of this case. General causation, warnings causation, specific causation. And it's just not as simple as the defendants say. They could have had plausible causes such as natural thinning, age-related hair loss, hormone-induced alopecia or other alopecias that are ongoing. And those scientific issues must be considered in light of the reasonableness inquiry. Thank you, Mr. Lambert. Thank you. Good morning, Your Honor. May it please the court. Alana Eisenstein on behalf of defendants, Sanofi, Preventus. Your Honor, the plaintiffs here want to start the injury at the end. The start of the injury under Louisiana law is what matters. It is when they know and reasonably believe that they have suffered a wrong. And that does not occur under Louisiana law when they know it is permanent. It occurs when they know that their hair loss continued beyond their expectations after the conclusion of chemotherapy. Let me ask you about that. It does seem to me that this case's arguments are structured along the lines of they were aware from the label and what they were told by doctors as a result of the label that temporary hair loss was possible, was likely, whatever, but not to be surprised if you have it. And so the injury really is permanent hair loss or at least hair loss that is more than temporary. What's wrong with that construct? Your Honor, I think the latter part of what you said, which is hair loss that is more than temporary, is more accurate. While plaintiffs use the word permanent, what they mean by that is not that they knew conclusively that this was irreversible. This was an injury that they claim was obvious to them every day from the conclusion of chemotherapy was something that was a devastating and disappointing event when they expected their hair to regrow at the conclusion of chemotherapy. And notably, plaintiffs set the timeline for when they said that temporary to ongoing or persistent timeframe of which they said they were not warned started. They set that at the six-month mark after the conclusion of chemotherapy. That's in their pleadings. It's also consistent with their own testimony about their expectations. Each of the plaintiffs testified that based on the advice that they received from their physicians, they expected that shortly after or within months of the conclusion of chemotherapy, their hair would regrow. And that when it didn't, that was when they had cause for alarm and started to experience the damage and injury. Recall, this is a failure to warn claim. So what were they not warned of? They said they weren't warned that this would be something other than a temporary condition that would last during the duration of chemotherapy. It was when it extended beyond that point that plaintiffs claim that they experienced this injury, not when they were told that this was permanent. In fact, most of the plaintiffs don't, these plaintiffs don't even say they have been confirmed that their injury is permanent today. So according to their own pleadings, their injury wouldn't have accrued even sitting here today. So the idea that... Let me ask you about that. You're talking about the six months and obviously the plaintiffs have disagreement with the six months, but the way the district judge looked at it, it does seem to me that they are stuck potentially, and we'll have to analyze that with their complaint that says six months is when permanent injury or non-temporary, I wouldn't quibble too much on the terminology, but not that you're quibbling, but nonetheless, non-temporary. And maybe that has more relevance though, respond to this, more relevance into the facial prescription issue. They've defined non-temporary as six months, and that's what the complaint says. And so six months is when the injury occurred, and they reasonably should have been aware of the injury, even if they didn't know the cause of it. But how does that affect contra-non? It does seem to me that that is getting into the reasonableness more than facial prescription. How about that dividing line? Give me a response. Yes, Your Honor. I think you are right, but I think that contra-nonvalentum is not applicable here on the basis of their purported lack of causal connection between a taxiteer and their ongoing hair loss for a couple of reasons. So on the facial prescription, I agree with you entirely. Their claim is facially prescribed. They've defined their injury as a failure to regrow hair six months after the conclusion of chemotherapy. And they cite studies that comport with that, that under normal circumstances, temporary hair loss would be expected to resolve three to six months after the conclusion of chemotherapy. And here, after that six-month mark is actually the outer edge. Before you leave that, please don't lose your train of thought. I'm doing my best to cause you to, I guess. It seems to me that some of the case laws is not all that clear. The same thing could be said about our case law, no doubt. Of when the Louisiana courts are really moving into contra-non and when they're saying there's not facially prescribed. And so what you just said, I think fits some understanding of Louisiana law, but not necessarily with all. Do you find it clear of when we really are entering into contra-non as opposed to some sort of slippage in facial prescription? Well, Your Honor, I think that plaintiff's site that blur the line in particular, a medical malpractice cases, which I note are governed by a different statute and a statute which actually requires that evidence of a tort, evidence of malpractice rather than just an injury. Plaintiff's site should say a dispute that Louisiana is a state that requires knowledge of a tort. It is an injury state. When knowledge of the injury is known to plaintiffs, that is when the prescriptive period applies. But let me move on to contra-nonvolentum because as I understand plaintiff's argument, number one, they claim that contra-nonvolentum applies because they lack knowledge or reasonable knowledge of a causal connection. Well, first of all, clearly you don't need proof of a causal connection. It's when a plaintiff suspects something is wrong that triggers the duty to seek out the person or entity she If it's a potential or possible cause, that is when under the contra-nonvolentum doctrine that no longer applies and the prescriptive period runs. Let's turn to the facts here. There's a cocktail of drugs. So how would the plaintiff have known to sue your client? So, Your Honor, that is the case in many other instances and under Louisiana law and similarly in many other states' laws. Knowing that one of a collection of potential tort feasors were responsible triggers still the duty of diligence. And here, plaintiffs did none. They made no effort to seek out who was responsible. Clearly, they sued us eventually when they got to their lawyer, which they waited to do until they saw a lawyer at. But the facts here, I just want to be clear, establish that the plaintiffs in fact subjectively believed that chemotherapy caused their hair loss. Each plaintiff testified that she attributed her ongoing hair loss to chemotherapy. And that was the fact that triggered the duty to investigate the cause. This is a failure to warn. Let me ask you the same thing I asked your friends on the other side and I hope it does remain friendly. What would these women have found either by asking their doctors? I mean, you probably all are very familiar with the case we had a few weeks ago, you in particular though. And we had evidence there that maybe or maybe it's not in this case and you can respond to that. But how would they have learned by going through some sort of diligence that Taxotere was involved in? When would they have learned it? So, Your Honor, I want to start with the fact that the actual injury that plaintiffs claim was obvious to them and they agree that it's obvious to them. The injury that they claim is a failure to warn. They knew that they were not advised by their doctors that hair loss may continue. They knew it was obvious to them every day that the hair loss persisted. And that was enough to trigger the claim. But in terms of the permanence, which is what plaintiffs want to specifically focus on, even there, which I don't think is relevant to this claim, there was publicly to 35 of our brief, but if you'd like the record sites in sort of general terms, there were publicly available reports, studies, and articles that discuss the possible link between Taxotere and permanent hair loss. There was the Taxotere's website, which is an online blog formed in 2006, consisting of women who have said that they experienced persistent and permanent hair loss caused by Taxotere. And moreover, I might add, in their own complaint, they cite studies from 2006 and 2010 that drew this link at paragraphs 183 and 184 of their very own complaint. So, the idea that there was not information out there in terms of the medical literature studies or even in the public arena is simply false. But plaintiffs wouldn't know that because by each of their admission, they exercised no diligence. So, Judge Malazzo made these findings in each of her decisions in granting summary judgment for Ms. Thibodeau. She said she had noticed to discover the cause of the problem, but did not act to discover the cause. She never inquired with her doctors, even though, according to the testimony of her dermatologist, she saw her dermatologist three times about an unrelated matter. When she was asked whether she took any steps to determine why her hair wasn't growing back, she said, not really. The same is true for Francis and Johnson. Each admitted that they did not inquire of their doctor. They took no steps to investigate. They undertook no research. So, this case, you know, the plaintiffs rely on a case called Lenny versus Exxon Mobil. Well, that case is a case that supports us. In that case, it's a Louisiana Appellate Court case. The court held failure to make even a rudimentary investigation into the illness, and death appears unreasonable. And to Judge Costa, your point, in Lenny, Mr. Lenny was a smoker. He developed lung cancer, and he was attributing his injury to exposure to radiation at work. But nevertheless, the court found that his claim was prescribed because he failed to inquire and his estate failed to inquire about the causes of his lung cancer, even though there were multiple options available. The same was true in Luckett. That was a case by this court, where the airline passenger had failed to take her heart medication because the airline lost the luggage. And again, the court said a medical diagnosis isn't required and that the commencement of prescription doesn't wait for a pronouncement of a victim's physician or an expert. I also want to note that the focus on the label is a total misnomer. The label, the 2015 label update, is directed at physicians, not at plaintiffs. And so labeling and a failure to warn under the learned intermediary doctrine is a doctrine that goes to the warning of to physicians and experts. What plaintiffs knew was something that they had within their lay knowledge, which is that they had an expectation. In fact, they told something about hair loss, which was, they said, they were told it was temporary. And what they're alleging here is that the warning label, and therefore through their doctor, they were not informed that this could persist. This is something that they knew all along. They did not need any form of expertise to determine. Besides this time, let me ask you a few questions about this equitable doctrine. There's some argument in your brief or suggestion, maybe not really arguing it, that the contra non has not yet been applied in Louisiana to this sort of case. Is that accurate? I don't think so, your honor. I mean, I think that it could be applied in theory, but I, sorry, your honor. The second question I have, based more on what your oral argument has just been, is it your position that knowing of the injury, it's no longer non-temporary, knowing that the injury means whatever investigation would have been reasonable to do, there still was an obligation to sue, to use Judge Costa's words, all the pharmaceutical companies involved in the cocktail, if they had not yet determined which one might have been contra non, that you don't really need, that you're not allowed this equitable tolling, so long as you know a collection of individuals. I mean, what I'm worried is that your argument takes into unnecessary litigation that is worrisome to people in our position. Your honor, I think that's exactly right. What is, all that was required is that, that in our case, Sanofi and Taxotere was the possible cause, a potential cause. And the fact that there may have been other manufacturers also responsible, conjointly responsible, is something that would bear out a discovery, and that plaintiffs would sort out. That happens day in and day out in tort cases. In fact, here, plaintiffs, in fact, sued a whole collection of not only Sanofi, but also the generic manufacturers, until they sorted out which one it was that they took. So that's a common feature of tort law. But the courts have been clear that even where the cause is unclear, the duty to exercise diligence to pursue the claim is not relieved of the plaintiff. So the Carter case... The case that's on appeal now from an actual trial, the Bellwether trial, maybe one of many, which was a defense verdict, with the jury answering, I think, that Taxotere was not shown to be responsible for the loss. Is that an issue that remains in this case, where the Taxotere is even the cause of this hair loss? Well, Your Honor, certainly defendants have disputed causation in particular cases. And in terms of specific causation, in the case you're referring to, Ms. Earnest's case, indeed, the defendants won because the jury found there wasn't sufficient evidence, given the collection of jugs of causation. But to be clear, this is a question of statute of limitations. Plaintiffs are still obligated to bring suit in Louisiana within a year of the prescriptive period. And the fact that there are questions about whether it was that drug or an alternative, Mr. Palmer referenced Arimidex and other treatments that plaintiffs might have been taking, does not toll the statute of limitations. I want to follow up on your answer to Judge Southwick. So someone knows that they have permanent hair loss, they realize that, and they've taken seven drugs over the previous year. You're saying they have to sue all seven? I mean, isn't it inconsistent with, in federal court rule 11 obligations, that you have to have some legitimate basis for believing the defendant is responsible? Of course, Your Honor. And so the duty falls upon the plaintiff to undertake a reasonable investigation of the cause under those circumstances. And where the cause can't be determined as between several potential causes, then they pursue those that are reasonable. But here, plaintiffs individually and subjectively stated that they never attributed their hair loss to anything other than chemotherapy. Ms. Francis testified, for example, she believed all three chemotherapy drugs played a role in her hair falling out. But that doesn't mean that she doesn't have to sue for some indeterminate period of time. In fact, it may have been the fact that all three drugs played a role or a set of drugs, different drugs played a role in her hair loss. But if she wants to hold Sanofi responsible, she has a duty to time period prescribed by Louisiana law. You know, often it's a question of whether the plaintiff, when a plaintiff is charged with having act reasonably or unreasonably, it is a question of fact that is specific to that individual or the circumstances surrounding them and so on. Now, why do you say here that the question of the response of the plaintiffs is a question of law that we can decide and not a question of fact for a fact finder? It's because the plaintiffs did nothing to investigate their claims here. And there's not a close call about whether this was a reasonable diligence that they exercised. They themselves admitted that they took no action. For example, what your position is that you would hold as a matter of law that they are under a duty to engage in reasonable diligence to determine the cause of their injury and that they failed to do that. And consequently, they failed to make a reasonable inquiry within that period of time. And consequently, there is no issue of fact. Is that what you're saying? When they acted reasonably, how do we know the circumstances of these individuals? What may have prevented this one or that one from making inquiries? So, Your Honor, we investigated that in summary judgment. So this is summary judgment and those facts are in this record. The plaintiffs were asked, did you ask your doctor? No, I did not. Did you seek out treatment from a dermatologist and ask them? No, I did not. Did you conduct any investigation? No, I did not. Did you attribute your hair loss to anything other than your chemotherapy? No, I did not. So under those circumstances, these facts, these particular plaintiffs, they've made clear that they were on notice of their claim and they entirely failed to follow up on it. And to Your Honor's question about whether this can be established as a matter of law, the Lenny case, the Carter versus Matrix case, the Zarelto case, this isn't unprecedented to say that where there is a failure to exercise any diligence, it's simply not prescribed. And that's because contra non volentem applies when a plaintiff is prevented by external sources from filing a claim. Plaintiffs have pointed to nothing that prevented them from reasonably investigating the reason why their hair did not grow back as they expected it to at the conclusion of chemotherapy. There are no further questions, Your Honor. I ask that this court affirm the grant of summary judgment as to each of the plaintiffs in this case. Let me ask you this question. This footnote to your summary at the end, what do you make a crochet versus Bristol Mars? Were we looking too much in that case at what the plaintiff himself knew about the role of the vilify or as opposed to some other standard? What's your response to whether Crochet had it right or not? It's not precedent for us. So whatever you say is not, you know, interpreting a precedential opinion. We're free to ignore whatever may be wrong. So, Your Honor, I think that Crochet had it right when they said that what the standard was, whether the plaintiff would reasonably associate his symptoms with the medication here, plaintiffs not only reasonably associated the symptoms, which is hair loss, ongoing hair loss with their chemotherapy treatment. They, in fact, associated it with chemotherapy. And to distinguish Crochet in Crochet, the doctor had informed plaintiff that his symptoms, his neurologic symptoms were Parkinsonism, not the drug in question here. Plaintiffs all along associated their ongoing hair loss with chemotherapy that triggered a duty to investigate. And they were not entitled to wait five to six years past the time that the one year prescriptive period would end in order to file. Their claims are plainly time hard. Thank you. We'll hear the rebuttal. I'll add one minute to the time, Kim. Thank you, Your Honor. We emphatically deny that the record reflects that each of these three appellants associated their ongoing hair regrowth problems with chemotherapy. In fact, the opposite. They said the opposite. They admitted that the temporary hair loss they acknowledged had been due to chemotherapy. I promise you that if this case goes to trial, Sanofi will argue, as it has already argued, that the hormone therapy each of these women had, not their chemotherapy, caused the hair regrowth problem. The futility of the inquiry is a critical fact here. The very period of time these plaintiffs were accused of not investigating, not finding out the truth, their doctors didn't know the truth and have so testified in the record. The question whether the failure to investigate is reasonable or not should go to the jury. In choosing to use summary judgment to address what is inherently a fact question of reasonableness under the circumstance, the defendant necessarily assumed and carries at all times the burden of showing. Ms. Azenstein says that it's not a question of fact, the reasonableness of your clients. If that has all been resolved, they explored that fully up to the point of summer judgment and absolutely no evidence was introduced that would indicate that there was a reasonable diligence on the part of your clients. Well, with due respect, your honor, I don't think that's the case. I think that the deposition testimony of the plaintiff is that if each plaintiff is that they considered the temporary hair loss over with, the natural process of hair regrowth was continuing. They knew of cases where it took longer than expected. They were hopeful the hair would continue to grow back. Now, we may say that it was stupid, that was folly, that was but surely the question of all of the circumstances of that state of mind being taken into account has to be a jury call. Now, the other thing that we usually call the things that you outlined there, don't we usually just label that that lack of conduct as a failure to pursue due diligence? That's a matter of law. But the futility of the pursuit of inquiry is important as a circumstance to weigh. What the doctors have testified they did not know and never told these ladies is an important circumstance to weigh. The hormone therapy and other possible causes of their loss is a circumstance to weigh. The burden remained on them. Because this was a summary judgment motion practice vehicle and because prescription is an issue, every inference of fact that's in this, every issue of material fact that can go either way gets resolved in favor of trial by jury. These ladies have been denied their day in court because one judge below decided that six months after chemo they had constructive awareness of an injury and should do something. That six month post-injury date which we have sought dearly to avoid has been imposed on every plaintiff because of a master complaint adoption. You can search the annals of MDL for centuries and never find the extrapolation of a general pleading allegation that gives one of many definitions of permanent injury and is hammered here on each plaintiff to say now you're going to be constructively aware of a permanent injury six months after at that time. Why? Because it arrived in a time capsule from a later time in the future when you and your lawyers adopted that definition. I mean these ladies may today say yes looking back on it seeing that definition I guess it was even sooner. I don't know when it was permanent but to say that they actually at that point had constructive awareness of permanency because of something that happened in the future defies the logic of time and it's a back to the future scenario that was used. The use of that paragraph and Sanofi's response to that paragraph, your honor, was to deny it. They said that's not the definition. The medical literature speaks for itself but now they want to make this six months post-injury not only as something that look if these people were going to trial and a doctor was called on to say when did that hair loss become permanent doctor? There's all kind of different interpretations five years you know the scientific literature is all over the place. In that case when was it permanent? Just as a matter of fact just something we can know today forgetting about whether you're going to retroactively. Let me just get just if you can just sum up uh why you say the there was a lack of diligence. Now why do you say upon upon what premise did you base that that says that it is a question of fact? Your honor, I based that on the fact that the diligence question does not address the void in the record of any conceivable link to taxatier. The plaintiff has to know two things for the statute to run an injury and a legal claim. Judge Trish Malaza relied on Judge Fallon's decision in Xarelto in which I happen to be co-liaison counsel. We served up a test case Mr. Louvier. He was on Xarelto. He had a bleed. He went in the hospital. Doctor reduced the prescription. Had another bleed three weeks later. Went in the hospital. Doctor took him off Xarelto. You know what Judge Fallon said? Now the case was prescribed because the suit was filed many much later. Judge Fallon commenced the running of the statute on Louisiana's contra non-valent doctrine not on the initial bleed, not on the reduction of the prescription, not on the second bleed and hospitalization. It ran from when the doctor took him off the drug and he said that's the first time this plaintiff could be reasonably aware of not just an injury but some legal claim against the maker of Xarelto. Do you agree do you agree that your clients were under a duty to engage in reasonable diligence to determine what the cause of their injury was? I do not your honor for the simple reason that it said time and again in the case law mere apprehension of injury isn't enough to start the running of the statute. Now if your question is your honor was the clock running at the time these people should have been investigating? If the clock's that point with no proven constructive awareness of both injury and possible legal claim then you have turned Louisiana's contra non-valent doctrine on its head and you're inviting uninformed lawsuits. If the clock's not running and it's suspended it's running because as we say the record shows you can say they should have been looking into something. There's no constructive awareness uh basis for linking any injury even if perceived as permanent to taxateer among among six or three or whatever drugs and medication and hormone therapy. I think that covers it your briefs cover many other things as well. Any other questions for my colleagues? All right that ends it for the day and ends it for this sitting of this panel we are adjourned. Thank you. Thank you both all three of you.